1  **SARA M. PELOQUIN**
   California State Bar No.254945
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California 92101-5008
   Telephone: (619) 234-8467
4  sara_peloquin@fd.org

5  Attorneys for Mr. Samaniego-Canto

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE ROGER T. BENITEZ)**

11

12  UNITED STATES OF AMERICA,        )    CASE NO.08CR0800-BEN
                                     )    DATE:  May 19, 2008
             Plaintiff,              )    TIME:   2:00 p.m.
13                                   )
    v.                               )    STATEMENT OF FACTS AND
14                                   )    MEMORANDUM OF POINTS AND
                                     )    AUTHORITIES IN SUPPORT OF
    MARIO SAMANIEGO-CANTO,           )    MR. SAMANIEGO-CANTO'S MOTIONS
15                                   )
             Defendant.              )
16  _____  )

17                              **I.**

18                    **STATEMENT OF FACTS**

19          The following statement of facts is based on materials received from the government.

20  Mr. Samaniego-Canto does not accept this statement of facts as his own, and reserves the right to take a

21  contrary position at motion hearings and trial. The facts alleged in these motions are subject to amplification

22  and/or modification at the time these motions are heard.

23          Mr. Samaniego-Canto was arrested on January 5, 2008. The probable cause statement accompanying

24  the January 7, 2008 complaint alleges that Border Patrol Agent Worley encountered Mr. Samaniego-Canto

25  approximately three and a half miles east of the San Ysidro Port of Entry and three hundred yards north of

26  the international boundary line. It is further alleged that Mr. Samaniego-Canto admitted that he was an alien

27  with no permission to enter the United States. Records checks allegedly revealed that Mr. Samaniego-Canto

28  was a deported alien. On March 19, 2008, the January 2007 Grand Jury returned a one count indictment

1  charging Mr. Samaniego-Canto with attempted entry after deportation a violation of 18 U.S.C. §1326 (a) and

2  (b).

3       These motions follow.

## II.

### MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

6       Mr. Samaniego-Canto  moves for the production of the following discovery.  This request is not

7  limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in

8  the custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  See

9  United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

10      (1)     Mr. Samaniego-Canto's Statements.  The government must disclose to Mr. Samaniego-Canto

11  all copies of any written or recorded statements made by him; the substance of any statements made by

12  Mr. Samaniego-Canto which the government intends to offer in evidence at trial -- either in its case-in-chief

13  or in rebuttal; see Id., any response by him to interrogation; the substance of any oral statements which the

14  government intends to introduce at trial and any written summaries of Mr. Samaniego-Canto's oral statements

15  contained in the handwritten notes of the government agent; any response to any Miranda warnings which may

16  have been given to him; as well as any other statements by Mr. Samaniego-Canto.  Fed. R. Crim.

17  P. 16(a)(1)(A)[1].  Mr. Samaniego-Canto specifically requests production of a copy of the taped proceedings

18  and any and all documents memorializing the deportation proceedings allegedly held and any other

19  proceedings that the government intends to rely upon at trial. The Advisory Committee Notes and the 1991

20  Amendments to Rule 16 make clear that the Government must reveal all the accused's statements, whether

21  oral or written, regardless of whether the government intends to make any use of those statements.  Federal

22  Rule of Criminal Procedure 16 is designed "to protect the defendant's rights to a fair trial."  United States v.

23  Rodriguez, 799 F.2d 649 (11th Cir. 1986); see also United States v. Noe, 821 F.2d 604, 607 (11th Cir. 1987)

24  (reversing conviction for failure to provide statements offered in rebuttal -- government's failure to disclose

25  statements made by the defendant is a serious detriment to preparing trial and defending against criminal

26  charges).

27  _____

28       [1]  Of course, any of Mr. Samaniego-Canto's statements, which are exculpatory, must be
produced, as well.  See Brady v. Maryland, 373 U.S. 83 (1963).

1      (2)  <u>Arrest Reports and Notes</u>.  Mr. Samaniego-Canto  also specifically requests that the

2 government turn over all arrest reports, notes and TECS records not already produced that relate to the

3 circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to, any

4 rough notes, records, reports, transcripts, referral slips, or other documents in which statements of

5 Mr. Samaniego-Canto or any other discoverable material is contained.  Such material is discoverable under

6 Fed. R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>.  The government must produce arrest reports,

7 investigators' notes, memos from arresting officers, sworn statements, and prosecution reports pertaining to

8 the defendant.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(B) and (C), 26.2 and 12(I); <u>United States v. Harris</u>, 543 F.2d

9 1247, 1253 (9th Cir. 1976) (original notes with suspect or witness must be preserved); <u>see also</u> <u>United States</u>

10 <u>v. Anderson</u>, 813 F.2d 1450, 1458 (9th Cir. 1987) (reaffirming <u>Harris</u>' holding).

11      (3)  <u>Brady Material</u>.  Mr. Samaniego-Canto requests all documents, statements, agents' reports,

12 and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of

13 the government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Under <u>Brady</u>, <u>Kyles</u> and their progeny,

14 impeachment, as well as exculpatory evidence, falls within the definition of evidence favorable to the accused.

15 <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).  This

16 includes information obtained from other investigations which exculpates Mr. Samaniego-Canto.

17      (4)  <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The

18 government must also produce this information under <u>Brady v. Maryland</u>.  This request includes any

19 cooperation or attempted cooperation by Mr. Samaniego-Canto, as well as any information, including that

20 obtained from other investigations or debriefings, that could affect any base offense level or specific offense

21 characteristic under Chapter Two of the Guidelines.  Mr. Samaniego-Canto also requests any information

22 relevant to a Chapter Three adjustment, a determination of his criminal history, and information relevant to

23 any other application of the Guidelines.

24      (5)  <u>Mr. Samaniego-Canto's Prior Record</u>.  Mr. Samaniego-Canto requests disclosure of his prior

25 record.  Fed. R. Crim. P. 16(a)(1)(D).

26      (6)  <u>Any Proposed 404(b) Evidence</u>. The government must produce evidence of prior similar acts

27 under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, "upon request of the

28 accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of

1  any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the purpose for

2  which introduction is sought.  This applies not only to evidence which the government may seek to introduce

3  in its case-in-chief, but also to evidence which the government may use as rebuttal.  See United States v.

4  Vega, 188 F.3d 1150 (9th Cir. 1999).  Mr. Samaniego-Canto is entitled to "reasonable notice" so as to "reduce

5  surprise," preclude "trial by ambush" and prevent the "possibility of prejudice."  Id.; United States v. Perez-

6  Tosta, 36 F.3d 1552, 1560-61 (11th Cir. 1994).  Mr. Samaniego-Canto requests such reasonable notice at least

7  two weeks before trial so as to adequately investigate and prepare for trial.

8          (7)    Evidence Seized.  Mr. Samaniego-Canto requests production of evidence seized as a result

9  of any search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(E).

10         (8)    Request for Preservation of Evidence.  Mr. Samaniego-Canto  specifically  requests  the

11  preservation of any and all physical evidence that may be destroyed, lost, or otherwise put out of the

12  possession, custody, or care of the government and which relates to the arrest or the events leading to the

13  arrest in this case.  This request includes, but is not limited to, the results of any fingerprint analysis,

14  Mr. Samaniego-Canto's personal effects, and any evidence seized from Mr. Samaniego-Canto or any third

15  party in relation to this case.

16         In addition, Mr. Samaniego-Canto requests that the Assistant United States Attorney assigned to

17  this case oversee a review of all personnel files of each agent involved in the present case for impeachment

18  material.  Kyles, 514 U.S. at 419; United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991); United States v.

19  Lacy, 896 F.Supp. 982 (N.D. Ca. 1995).  At a minimum, the prosecutor has the obligation to inquire of his

20  agents in order to ascertain whether or not evidence relevant to veracity or other impeachment exists.

21         (9)    Tangible Objects.  Mr. Samaniego-Canto requests the opportunity to inspect and copy, as well

22  as test, if necessary, all other documents and tangible objects, including photographs, books, papers,

23  documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or

24  intended for use in the government's case-in-chief or were obtained from or belong to Mr. Samaniego-Canto.

25  Fed. R. Crim. P. 16(a)(1)(E).  Specifically, to the extent they were not already produced, Mr. Samaniego-

26  Canto requests copies of all photographs in the government's possession, including, but not limited to,

27  photographs of himself and any other photos taken in connection with this case.

28

1    (10) <u>Expert Witnesses</u>. Mr. Samaniego-Canto requests the name, qualifications, and a written

2 summary of the testimony of any person that the government intends to call as an expert witness during its

3 case in chief. Fed. R. Crim. P. 16(a)(1)(G). The defense requests that notice of expert testimony be provided

4 at a minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to

5 this testimony, including obtaining its own expert and/or investigating the opinions and credentials of the

6 government's expert. The defense also requests a hearing in advance of trial to determine the admissibility

7 of qualifications of any expert. <u>See</u> <u>Kumho v. Carmichael Tire Co.</u> 119 S. Ct. 1167, 1176 (1999) (trial judge

8 is "gatekeeper" and must determine reliability and relevancy of expert testimony and such determinations may

9 require "special briefing or other proceedings . . ..").

10    (11) <u>Evidence of Bias or Motive to Lie</u>. Mr. Samaniego-Canto requests any evidence that any

11 prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or

12 distort his or her testimony.

13    (12) <u>Impeachment Evidence</u>. Mr. Samaniego-Canto requests any evidence that any prospective

14 government witness has engaged in any criminal act whether or not resulting in a conviction and whether any

15 witness has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady v.</u>

16 <u>Maryland</u>.

17    (13) <u>Evidence of Criminal Investigation of Any Government Witness</u>. Mr. Samaniego-Canto

18 requests any evidence that any prospective witness is under investigation by federal, state or local authorities

19 for any criminal conduct.

20    (14) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>. The

21 defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

22 that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

23 any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

24 alcoholic.

25    (15) <u>Jencks Act Material</u>. Mr. Samaniego-Canto requests production in advance of trial of all

26 material, including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. §

27 3500; Fed. R. Crim. P. 26.2. Advance production will avoid the possibility of delay at Mr. Samaniego-

28 Canto's request to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute

1   an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under

2   section 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v.

3   Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that, where an agent goes over interview notes with subject,

4   interview notes are subject to Jencks Act).

5       (16)  Giglio Information.   Pursuant to Giglio v. United States, 405 U.S. 150 (1972),

6   Mr. Samaniego-Canto requests all statements and/or promises, express or implied, made to any government

7   witnesses, in exchange for their testimony in this case, and all other information which could arguably be used

8   for the impeachment of any government witnesses.

9       (17)  Agreements Between the Government and Witnesses.  In this case, Mr. Samaniego-Canto

10  requests identification of any cooperating witnesses who have committed crimes, but were not charged, so

11  that they may testify for the government in this case.  Mr. Samaniego-Canto also requests discovery regarding

12  any express or implicit promise; understanding; offer of immunity; past, present, or future compensation; or

13  any other kind of agreement or understanding, including any implicit understanding relating to criminal or

14  civil income tax, forfeiture or fine liability between any prospective government witness and the government

15  (federal, state and/or local).  This request also includes any discussion with a potential witness about, or

16  advice concerning, any contemplated prosecution, or any possible plea bargain, even if no bargain was made,

17  or the advice not followed.

18      Pursuant to United States v. Sudikoff, 36 F.Supp.2d 1196 (C.D. Cal. 1999), the defense requests

19  all statements made, either personally or through counsel, at any time, which relate to the witnesses'

20  statements regarding this case, any promises -- implied or express -- regarding punishment/prosecution or

21  detention of these witnesses, any agreement sought, bargained for or requested, on the part of the witness at

22  any time.

23      (18)  Informants and Cooperating Witnesses.  Mr. Samaniego-Canto requests disclosure of the

24  names and addresses of all informants or cooperating witnesses used, or to be used, in this case, and in

25  particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in

26  the crime charged against Mr. Samaniego-Canto.  The government must disclose the informant's identity and

27  location, as well as the existence of any other percipient witness unknown or unknowable to the defense.

28

08CR0800-BEN

1    Roviaro v. United States, 353 U.S. 53, 61-62 (1957). The government must disclose any information derived

2    from informants which exculpates or tends to exculpate Mr. Samaniego-Canto.

3           (19)    Bias by Informants or Cooperating Witnesses. Mr. Samaniego-Canto requests disclosure of

4    any information indicating bias on the part of any informant or cooperating witness. Giglio v. United States.

5    Such information would include what, if any, inducements, favors, payments or threats were made to the

6    witness to secure cooperation with the authorities.

7           (20)    Inspection and Copying of A-File. Mr. Samaniego-Canto requests that this Court order the

8    government to make all A-Files relevant to Mr. Samaniego-Canto  available for inspection and copying.  To

9    date defense counsel has not received any A-File documents.  Mr. Perez-Ramos requests a full copy of his

10   A-file and any other immigration files linked to his immigration history. Mr. Samaniego-Canto specifically

11   requests the documents memorializing the alleged deportation proceedings and any other proceedings that the

12   government intends to rely upon at trial.

13          Mr. Samaniego-Canto additionally requests that the Court order the government to allow him the

14   opportunity to review his A-file in its entirety. First, the A-file contains documentation concerning his alleged

15   deportation. Mr. Samaniego-Canto must be afforded the opportunity to challenge the validity of the

16   indictment. Mr. Samaniego-Canto may do this by challenging the lawfulness of the alleged deportation. The

17   documents in the A-file are essential to a potential challenge to the indictment and the lawfulness of the

18   deportation.

19          Second, the government will likely try to show at trial that a government officer searched the A-file

20   and did not find an application by Mr. Samaniego-Canto for permission to enter the United States. Mr.

21   Mr. Samaniego-Canto anticipates that the government will attempt to admit a "Certificate of Non-Existence

22   of Record" against him, arguing that if Mr. Samaniego-Canto had ever applied for permission to enter the

23   United States, such an application would be found in the A-file and because such an application is not in the

24   A-file, Mr. Samaniego-Canto must not have applied for permission to enter the United States.

25          Although the certificate might be admissible, the question of the thoroughness of the search

26   conducted by the government of the A-file  is, and should be, open to cross-examination. United States v.

27   Sager, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation."). Mr. Samaniego-

28   Canto should be able to review his A-file in order to see whether any application for lawful admission exists.

1  Moreover, Mr. Samaniego-Canto should also be able to verify whether other documents that would ordinarily

2  be in the A-file are "non-existent," or otherwise missing from his A-file.  Mr. Samaniego-Canto may assert

3  a defense that his application for lawful entry was lost or otherwise misplaced by the government. He must

4  be allowed the opportunity to review his A-file and the manner in which it is being maintained by the

5  government in order to present this defense.

6       Finally, the A-File may contain <u>Brady</u> material.  Mr. Samaniego-Canto requests all documents,

7  statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which

8  affects the credibility of the government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Under <u>Brady</u>, <u>Kyles</u>

9  and their progeny, impeachment, as well as exculpatory evidence, falls within the definition of evidence

10 favorable to the accused.  <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427

11 U.S. 97 (1976).   This includes information obtained from other investigations which exculpates

12 Mr. Samaniego-Canto.

13      Brady material also includes and information that may lead to a lower sentence under the guidelines.

14 The A-File is likely to contain documents from alleged prior conviction that could affect any base offense

15 level or specific offense characteristic under Chapter Two of the Guidelines.  Mr. Samaniego-Canto also

16 requests any information relevant to a Chapter Three adjustment, a determination of his criminal history, and

17 information relevant to any other application of the Guidelines.

18      The A-File is likely to contain information regarding prior similar acts.  The government must

19 produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.

20 In addition, "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of

21 trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid.

22 404(b) at trial and the purpose for which introduction is sought.  This applies not only to evidence which the

23 government may seek to introduce in its case-in-chief, but also to evidence which the government may use

24 as rebuttal.  <u>See</u> <u>United States v. Vega</u>, 188 F.3d 1150 (9th Cir. 1999).  Mr. Samaniego-Canto is entitled to

25 "reasonable notice" so as to "reduce surprise," preclude "trial by ambush" and prevent the "possibility of

26 prejudice."  <u>Id.</u>; <u>United States v. Perez-Tosta</u>, 36 F.3d 1552, 1560-61 (11th Cir. 1994).  Mr. Samaniego-Canto

27 requests such reasonable notice at least two weeks before trial so as to adequately investigate and prepare for

28 trial.

1    (21)    <u>Residual Request</u>.  Mr. Samaniego-Canto intends, by this discovery motion, to invoke his

2    rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

3    Constitution and laws of the United States.  Mr. Samaniego-Canto requests that the government provide his

4    attorney with the above-requested material sufficiently in advance of trial to avoid unnecessary delay prior to

5    cross-examination.

6    **III.**

7    **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S
INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY
RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH
AMENDMENT BY DEPRIVING MR. SAMANIEGO-CANTO OF THE TRADITIONAL
FUNCTIONING OF THE GRAND JURY**

8

9

10    **A.    Introduction.**

11    The indictment in the instant case was returned by the January 2007 grand jury.  <u>See</u> CR at 6.[2]  That

12    grand jury was instructed by Judge Burns on January 11, 2007.  <u>See</u> Reporter's Partial Transcript of the

13    Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's

14    instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases

15    challenging a form grand jury instruction previously given in this district in several ways.[3]  These instructions

16    compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire

17    of the grand jury panel, which immediately preceded the instructions at Ex. A.  <u>See</u> Reporter's Transcript of

18    Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[4]

19    **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or
Not Probable Cause Exists and That They Have No Right to Decline to Indict When the
Probable Cause Standard Is Satisfied.**

20

21

22    [1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

23
24    [2] <u>See</u>, <u>e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States
v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005) (<u>Navarro-
Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United
States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

25

26    [3] The transcript of the voir dire indicates that grand jurors were shown a video presentation
27    on the role of the grand jury.  Mr. Arredondo-Ortiz requests that the video presentation be produced.
<u>See United States v. Alter</u>, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the
28    grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are
not.").

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"

---

[5]  [4] See also id. at 20 ("You're all about probable cause.").

1                                If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

2

3         See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear

4    that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when

5    it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

6    committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

7    crime."

8         Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that,

9    in some unknown set of circumstances, they might decline to indict even where there was probable cause.

10   Because of the redactions of the grand jurors' names, Mr. Arredondo-Ortiz will refer to them by occupation.

11   One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).

12   The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were

13   not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified

14   immigration cases.  See id.

15        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

16   CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

17   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

18   Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have

19   possessed were simply not capable of expression in the context of grand jury service.

20                               Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the defendant is ultimately entitled to a fair trial and the

21   person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair

22   judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still

23   don't like what our government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your frame of mind, the

24   probably you shouldn't serve.  Only you can tell me that.

25        See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let

26   the grand juror know that it would not want him or her to decline to indict in an individual case where the

27   grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.

28   See id.  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion,

1   made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to

2   support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question

3   provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a

4   small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand

5   juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

6   them to vote "no bill" in the face of a showing probable cause.

7          Just in case there may have been a grand juror that did not understand his or her inability to exercise

8   anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

9   first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

10  "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

11  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations

12  into account.

13         Well, those things -- the consequences of your determination shouldn't concern you in the sense that
       penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the
14     punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.
       We want you to make a business-like decision of whether there was a probable cause. . . .

15

16         Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

17  Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

18         In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

19  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

20  juror is obligated to vote to indict if there is probable cause.

21             I can tell you sometimes I don't agree with some of the legal decisions that
           are indicated that I have to make. But my alternative is to vote for someone
22         different, vote for someone that supports the policies I support and get the
           law changed. It's not for me to say, "well, I don't like it. So I'm not going
23         to follow it here."

24             You'd have a similar obligation as a grand juror even though you might
           have to grit your teeth on some cases. Philosophically, if you were a
25         member of congress, you'd vote against, for example, criminalizing
           marijuana. I don't know if that's it, but you'd vote against criminalizing
26         some drugs.

27             That's not what your prerogative is here. You're prerogative instead is to
           act like a judge and say, "all right. This is what I've to  deal with
28         objectively. Does it seem to me that a crime was committed? Yes. Does
           it seem to me that this person's involved? It does." *And then your*

1        *obligation, if you find those to be true, would be to vote in favor of the case going forward.*

2

3       <u>Id</u>. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test,

4 which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

5       Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

6 paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

7 to indict in every case in which there was probable cause.

8            The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed

9            a drug offense?
           REA: It would depend on the case.

10            The Court: Is there a chance that you would do that?
           REA: Yes.

11            The Court: I appreciate your answers.  I'll excuse you at this time.

12       <u>Id</u>. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely

13 on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," <u>see id.</u>,

14 as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote

15 to indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

16 Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to

17 hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

18 because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[6]

19 <u>See id.</u> at 27.  That is why even the "chance," <u>see id.</u>, that a grand juror might not vote to indict was too great

20 a risk to run.

21     **2.**      **The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

22

23

24 _____

25      [6]  [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances"

26 before it has been presented with any evidence.  <u>See</u> Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the

27 case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury

28 was informed that it merely was redundant to the magistrate court "in most circumstances."  <u>See id.</u> This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

           08CR0800-BEN

1    In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

2    grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex.

3    A at 20.[7]

4         Now, again, this emphasizes the difference between the function of the
          grand jury and the trial jury. You're all about probable cause. If you think

5         that there's evidence out there that might cause you to say "well, I don't
          think probable cause exists," then it's incumbent upon you to hear that

6         evidence as well. As I told you, in most instances, *the U.S. Attorneys are
          duty-bound to present evidence that cuts against what they may be asking

7         you to do if they're aware of that evidence.*

8    Id. (emphasis added).

9    The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

10   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

11   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

12

13        [7] [6]These instructions were provided in the midst of several comments that praised the United
14   States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they
     "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be
15   honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The
     instructions delivered during voir dire go even further. In addressing a prospective grand juror who
16   revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38,
17   Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even
     while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense
18   to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith
     to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to
19   indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate
20   the charges against.").
          Judge Burns's discussion of his once having been a prosecutor before the Grand Jury
21   compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10.
     Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id.
22   at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases
23   for indictment where no probable cause existed.
          In addition, while Judge Burns instructed the Grand Jury that it had the power to question
24   witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the
     U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be
25   asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's
     independence is diluted by [such an] instruction, which encourages deference to prosecutors."
26   Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"
27   see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions
     provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow
28   instructions because, in fact, we are prohibited from examining jurors to verify whether they
     understood the instruction as given and then followed it.").

1  adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.  Thus,

2  Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

3  "adverse" or "that cuts against the charge."  See id.

4      **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers
              of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
5      **During Impanelment.**

6          The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

7  given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While

8  the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly

9  formalistic approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments

10 raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of

11 the grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the

12 January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction

13 of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable

14 to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

15 States v. Williams, 504 U.S. 36, 49 (1992).

16         For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

17 II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

18 deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

19 as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

20 (1978)).   Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

21 I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

22 prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

23 the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

24 also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

25 prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

26 _____

27      [8]  [7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
        majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28      imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
        constitutional independence.").

1 the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

2 "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

3 that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

4 § 15.2(g) (2d ed. 1999)).

5       Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

6 in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

7       The grand jury thus determines not only whether probable cause exists, but also whether to "charge
a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all,

8 a capital offense or a non-capital offense -- all on the basis of the same facts.  And, significantly, the grand jury
may refuse to return an indictment even "'where a conviction can be obtained.'"

9

10       Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's

11 description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand

12 jury "controls not only the initial decision to indict, but also significant questions such as how many counts

13 to charge and whether to charge a greater or lesser offense, including the important decision whether to charge

14 a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas

15 II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to

16 refuse to indict someone even when the prosecutor has established probable cause that this individual has

17 committed a crime." See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

18 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

19 (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

20 Ninth Circuit.  But not in Judge Burns's instructions.

21       **C.**    **Judge Burns's Instructions Forbid the Exercise of Grand Jury
Discretion Established in Both Vasquez and Navarro-Vargas II.**

22

23       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

24 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

25 in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every

26 finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at

27 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

28 pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

1  the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand

2  jurors, and thus to circumscribe the grand jury's constitutional independence."). <u>See also id</u>. ("The 'word'

3  should is used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u>

4  1579 (1999) (brackets in original)).

5       The debate about what the word "should" means is irrelevant here; the instructions here make no

6  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

7  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

8  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

9  indicting even though I think that the evidence is sufficient'...." <u>See</u> Ex. A at 8-9.  Thus, the instruction flatly

10  bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

11  would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>,

12  474 U.S. at 264.

13       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

14  an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, in context, it is clear that Judge Burns

15  could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge

16  Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there is

17  not probable cause, "then the grand jury should hesitate and not indict."  <u>See id</u>. at 8.  At least in context, it

18  would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for

19  the grand jury to [indict] even if it finds [no] probable cause." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205.  Clearly

20  Judge Burns was not.

21       The full passage cited above effectively eliminates any possibility that Judge Burns intended the

22  Navarro-Vargas spin on the word "should."

23       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that

24       they propose that we indict committed the crime?"

25       If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

26

27       <u>See</u> Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially

28  states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended

1  to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408

2  F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

3  protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

4  "responsibilities continue to include both the determination whether there is probable cause and the protection

5  of citizens against unfounded criminal prosecutions.") (citation omitted).

6       By the same token, if Judge Burns said that "the case should move forward" if there is probable cause,

7  but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

8  Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have intended

9  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

10 been his intent.  But even if it were, no grand jury could ever have had that understanding.[9]  Jurors are not

11 presumed to be capable of sorting through internally contradictory instructions.  See generally United States

12 v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume

13 that the jury followed the correct one") (citation, internal quotations and brackets omitted).

14      Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

15 clear to the grand jurors that "should" was not merely suggestive, but obligatory:

16      **(1)**      The first occasion occurred in the following exchange when Judge Burns conducted voir dire

17 and excused a potential juror (CSW):

18      The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want
        you to say, "Well, yeah, there's probable cause.  But I still don't like what the government
19      is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's
        your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
20      Prospective Juror: Well, I think I may fall in that category.
        The Court: In the latter category?
21      Prospective Juror: Yes.
        The Court: Where it would be difficult for you to support a charge even if   you thought the
22      evidence warranted it?
        Prospective Juror: Yes.
23      The Court: I'm going to excuse you then.

24      See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

25 prospective juror.  Even if the prospective juror did not like what the government was doing in a particular

26 _____

27      [9]  [8]  This argument does not turn on Mr. Samaniego-Canto's view that the Navarro-
   Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.
28 Rather, it turns on the context in which the word is employed by Judge Burns in his unique
   instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1  case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent

2  that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of

3  independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and

4  secondary deterrence as to the exercise of discretion by any other prospective grand juror.

5      (2)      In an even more explicit example of what "should" meant, Judge Burns makes clear that it

6  there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

7      Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

8      You'd have a similar *obligation* as a grand juror even though you might have to grit your
       teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote

9      against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote
       against criminalizing some drugs.

10

11     That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and
       to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that
       a crime was committed?  Yes.  Does it seem to me that this person's involved? It does."

12     *And then your obligation, if you find those things to be true, would be to vote in favor of*
       *the case going forward.*

13

14     Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

15  prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even

16  though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential

17  juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again,

18  in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and

19  the juror has no prerogative to do anything other than indict if there is probable cause.

20      Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

21  a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

22  rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

23  indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

24  prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

25  scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

26  prospective jurors, because his message is that there is no discretion not to indict.

27      (3)      As if the preceding examples were not enough, Judge Burns continued to pound the point

28  home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist

1  on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

2  here."  See id. at 61.

3       **(4)**      And then again, after swearing in all the grand jurors who had already agreed to indict in

4  every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it

5  reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

6  that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

7  the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

8       Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

9  penalties to which indicted persons may be subject.

10      Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case
        is about because there is a disparity between state and federal law.
11      The Court:  In what regard?
        Prospective Juror: Specifically, medical marijuana.
12      The Court: Well, those things -- the consequences of your determination shouldn't concern
        you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of*
13      *course, that they cannot consider the punishment or the consequence that Congress has*
        *set for these things. We'd ask you to also abide by that.*  We want you to make a business-
14      like decision of whether there was a probable cause. ...

15      See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable

16  cause" would obviously leave no role for the consideration of penalty information.

17      The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

18  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

19  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

20  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

21  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

22  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

23  consideration of penalty information.  See 474 U.S. at 263.

24      Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

25  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

26  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

27  contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

28

1  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

2  <u>Vasquez</u>:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same
>
> facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

8  474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

9  J., dissenting)); accord <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

10  the initial decision to indict, but also significant decisions such as how many counts to charge and whether

11  to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

12  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."

13  <u>See</u> <u>id.</u> at 264. Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury. The instructions therefore represent

14  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

15  jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

16  therefore be dismissed. <u>Id.</u>

17  The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

18  instructions excesses. The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

19  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

20  408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand

21  jury because "it is the *structure* of the grand jury process and its *function* that make it independent." <u>Id.</u> at

22  1202 (emphases in the original).

23  Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

24  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

25  of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting). The

26  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

27  making a probable cause determination ... unconstitutionally undermines the very structural protections that

28  the majority believes save[] the instruction." <u>Id.</u> After all, it is an "'almost invariable assumption of the law

1   that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

2   "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

3   in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

4   instructions because nothing will happen if they disobey them."  Id.

5        In setting forth Judge Hawkins' views, Mr. Arredondo-Ortiz understands that Judge Burns may not

6   adopt them solely because the reasoning that supports them is so much more persuasive than the majority's

7   sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

8        Here, again, the question is not an obscure interpretation of the word "should", especially in light of

9   the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

10  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

11  right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

12  Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

13        Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly states they

14  enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative,

15  excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex. A at 8; Ex.

16  B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors

17  who are no longer there, likely because they expressed their willingness to act as the conscience of the

18  community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising

19  its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting

20  as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &  n.6 (D.C.

21  Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules

22  of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

23  fashioned his own rules and enforced them.

24        **D.     The Instructions Conflict with Williams' Holding That There Is No Duty to Present
           Exculpatory Evidence to the Grand Jury.**

25

26        In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

27  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

28  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

1  common law. <u>See</u> 504 U.S. at 45, 51. Williams held that "as a general matter at least, no such 'supervisory'

2  judicial authority exists." <u>See</u> <u>id</u>. at 47. Indeed, although the supervisory power may provide the authority

3  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts

4  to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge Burns and

5  by Congress to ensure the integrity of the grand jury's functions,'" <u>id</u>. at 46 (citation omitted), it does not serve

6  as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id</u>. at 47 (emphasis

7  added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of

8  grand jury procedure." <u>Id</u>. at 50. As a consequence, Williams rejected the defendant's claim, both as an

9  exercise of supervisory power and as Fifth Amendment common law. <u>See</u> <u>id</u>. at 51-55.

10     Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

11 present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

12          Now, again, this emphasizes the difference between the function of the grand jury and the
            trial jury. You're all about probable cause. If you think that there's evidence out there that
13          might cause you say "well, I don't think probable cause exists," then it's incumbent upon
            you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are
14          duty-bound to present evidence that cuts against what they may be asking you to do if
            they're aware of that evidence.*

15

16     Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and

17 their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from

18 of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."

19 <u>See</u> <u>id</u>. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u>

20 <u>Navarro-Vargas</u>, 408 F.3d at 1207.

21     This particular instruction has a devastating effect on the grand jury's protective powers, particularly

22 if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

23 conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again,

24 the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably

25 unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be

26 excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should

27 consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will

28 present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause,

1    but, if none is presented by the government, they can presume that there is none.  After all, "in most instances,

2    the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if

3    they're aware of that evidence." See id.  Moreover, during voir dire, Judge Burns informed the jurors that "my

4    experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against

5    the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15 (emphasis added).

6    Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound"

7    prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will

8    be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See Ex. A at 27.

9           These instructions create a presumption that, in cases where the prosecutor does not present

10   exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

11   exculpatory evidence was presented, would proceed along these lines:

12          (1)    I have to consider evidence that undercuts probable cause.

13          (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

14                 evidence to me, if it existed.

15          (3)    Because no such evidence was presented to me, I may conclude that there is none.

16          Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

17   evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

18   bound prosecutor would have presented it.

19          The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

20   prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

21   probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

22   of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

23   the Fifth Amendment.

24                                              **IV.**

25                      **REQUEST FOR LEAVE TO FILE FURTHER MOTIONS**

26          Mr. Samaniego-Canto and defense counsel have received ninety pages of discovery in this case.  As

27   new information surfaces due to the government providing discovery in response to these motions or an order

28   of this Court, defense will find it necessary to file further motions, or to supplement existing motions with

1  additional facts.   Therefore, defense counsel requests the opportunity to file further motions based upon

2  information gained from discovery.

3                                                **V.**

4                                         **<u>CONCLUSION</u>**

5          For the reasons stated above, Mr. Samaniego-Canto moves this Court to grant his motions.

6                                         Respectfully submitted,

7

8  DATED:  May 5, 2008                      */s/ Sara M. Peloquin*
                                            **SARA M. PELOQUIN**
9                                           Federal Defenders of San Diego, Inc.
                                            Attorneys for Mr. Mario Samaniego-Canto

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28